United States v. Matthew Elias and Lateef Thompson, 2366-26 and 2366-27. Good morning, Your Honors. Jeremy Gutman from Matthew Elias. The district court in this case clearly abused its discretion when it admitted highly prejudicial evidence of a gang affiliation, evidence that before trial it had recognized would be carried a significant risk of unfair prejudice. And there are a number of problems with the court's ruling. The justification for the admission was purportedly to correct false testimony that Mr. Elias had given on his own behalf. The problem with that is that the testimony was not false. The testimony pointed to by the government was a denial of a prior relationship with the government's witness who was the mastermind of the robbery that took place and that Mr. Elias was the driver for, but not a participant in the actual events inside the house where the robbery took place. The denial was consistent with the testimony of the government's own witness who in fact testified that he had never met Mr. Elias before the night of the robbery. If you would, let's assume prejudice, assume error here. Could you walk me through how you see the harmless analysis? Yes, yes, well, because, and we raised a sufficiency point also. Because the evidence with regard to the critical element of knowledge was extremely weak. It hinged on- I mean, you have testimony that he's, A, he participated at least as the getaway driver of what turned out to be an armed robbery. You have the testimony that they're in the basement, I think, and Hitma says there's going to be guns and two others raised. I mean, and then there's the jailhouse calls. I shouldn't have let them in the car with a gun. So, you've got all of that. How then do you think about the sort of interplay between prejudice and the harmless analysis? Well, all of that is not, doesn't add up to, certainly not to proof beyond a reasonable doubt. First of all, on the question of the gun, the evidence, the only testimony regarding advance knowledge, that would have been a basis for advance knowledge that a gun was going to be used during the robbery, was a brief moment when two other participants briefly lifted up their sweatshirts to show that they were armed. At least as far as sufficiency is concerned, that's kind of more than enough, isn't it? I mean, your guy is there in the room. I mean, contrary to his story that I'm just a cabbie here, he's not sitting outside, you know, wondering what these guys are doing inside, but they ask me to stay and wait and pick them up again when they come out. He goes to the meeting where these guys who are planning an armed robbery, plan it in so many words, pretty much. The government's witness, who's the mastermind of this whole thing, says, you've got to be careful because you're going into a drug stash house, they probably have guns. And the, two of the participants then hold up their shirts, showing, maybe Elias can't see it, the guns that they have, and then the subject of you've got to be careful because if the guns is dropped. And all of this is happening in his presence. Now, it was a very good strategy, I guess, to ask the government's witness, well, were you watching his eyes? Did you see where he was looking when this happened? And he, of course, says no. But all of that, coupled with the fact that the jury heard his story, and at least from the judge's reaction, at least somebody who was watching this thought it was ridiculous, in light of all the other evidence. That sounds like a sufficient case, and it doesn't sound like a terribly weak one. I mean, your real argument is, the gang stuff is so prejudicial that that's terrible. Well, I don't agree completely with the assessment, because I would point out the testimony came out on direct when the government was, I think, trying to bolster the...  It wasn't everybody paying attention. And he said, well, I can't say that. I was talking to one person, and his testimony was, the two others reacted when he said something about there's going to be people armed. He didn't say anything about a reaction. Because to me, that makes him a little more credible than the average cooperator saying whatever the government wants to prompt him to say. But that's where the jury's side is on. He may have been credible, particularly in that moment. Can I focus you back, just mindful of time, to my colleague's question about the gang evidence? Because I'm trying to understand the significance of it, and what the jury actually got out of that whole thing. When I look at the pictures of the Facebook and the Instagram, they look like thousands of pictures I've seen of suburban naive kids trying to look cool, whatever. But it sounds like there's something really ominous in this evidence that I'm missing. Can you talk me through why the jury would have been so prejudiced by this? Well, and to be honest, it's the reason, why else would the government have made such a big point of introducing it? And they tell us in their brief to this court that their expectation was this evidence would assist the jury in drawing a conclusion on exactly the issue that we say is the weakest, that he did, in fact, know exactly what these other people were up to because he understood them as a fellow gang member. And I think that's the problem, is that, first of all, it's clear the evidence didn't serve any proper purpose. It was the limiting instruction by the court, said this is only to establish relationships with other participants. It didn't show that. The pictures were from two years after the robbery. And so they were introduced to establish something that they couldn't prove. So they had no probative value. And the government didn't try to connect it that way. In their summation, I think... They don't mention it in the summation. They don't, because there was nothing to connect it to, nothing proper to connect it to. Doesn't that undermine prejudice? No, no, because the prejudice, it wasn't... You know, our position is, and I think the record supports it, it was not... It couldn't have been admitted. It had no probative value for the limited purpose that it was ostensibly admitted for. But what it did do, as the government effectively acknowledges in their brief, what it did do was give the jury a reason to think, of course this guy knew what was going on, and whether or not... You know, and I would certainly say the evidence was not so strong that one or more jurors couldn't have had a reasonable doubt about did he think this was an armed robbery or did he maybe think it was a burglary or something else? And did he know that there was going to be... That people were carrying guns, even though they only briefly showed their guns. But I guess the question, the prejudice question is, is that a permissible inference or an impermissible inference? If he says, I've never heard of this guy who was organising this thing and had no idea what was going on, and there's evidence that would suggest that he's part of an association of which this guy is a prominent member, and so that casts down on the credibility of his denial that he knew what was going on. Is that an impermissible prejudicial inference or is that a probative inference? Well, first of all, the evidence didn't... It showed... The pictures were from two years after the robbery. Right. So they could not show that on the night of the robbery he had a relationship of any kind with this particular individual. The truth is, it's still... The evidence didn't specifically say anything about a relationship between him and any particular people who were involved in this robbery. The inference would be, if you're a part of this association, you know people who are prominent members. It would be not credible to disavow any knowledge of people who are... And I get the two-year thing, but I'm trying to figure out what the government had known, because the answer to the question was, you publicly represented yourself as being affiliated with the Makhbalis, not in 2017, sir. And then he says, you represented yourself before or after, and then he says, I believe it was 2019. So that's how it comes out, and I think that's part of the reason why it loses whatever probative value it has, and maybe the prejudice still attaches, I don't know. But you don't know that until the question's answered? Well, I think that ostensible purpose is somewhat... That subtle point wasn't made by the government on summation. It wasn't... You know, if that was the purpose, I think it's very tenuous, and I think it would still... There would be no way that it would be a proper balancing of prejudice. Presumably the government knew what the dates were when it introduced this, right? It knew when these photos came from. I mean, they're on social media, so I don't do any social media, so I don't know, but don't they have dates? I can't speak to what the government knew, but I would assume that they would know when these were posted to social media. Right. I wasn't questioning that so much as the government didn't know whether he would testify in a way that suggested that the 2019 postings reflected a different situation from 2017, which is essentially what he did. But... Yeah, that's fine. Well, if there aren't further questions about this, we'll hear from your counterpart. Thank you. Thank you. Mr Leisure, is that...? That's right. Paul Skip Leisure, CJA counsel for Mr Thompson. The first thing I want to mention is that we are arguing that the completed Hobbs Act robbery is not a crime of violence for 924C. I'm aware of Barrett, I'm aware of McCoy, and... And you're aware of the fact that the Supreme Court has Barrett teed up to decide whether there's going to be certiorari in that, so you're preserving that argument for the Supreme Court. That's partly it, and it's also... I want to make the record that McCoy specifically narrowed its own holding, and that's what I think opens the door to our argument here. It said, unlike in Taylor, the defendants have presented no hypothetical case in which a Hobbs Act robbery could be committed. Yeah, but then, Barrett, I mean, we're done with that. This Court is done with that. The Supreme Court may very well say of you, they may very well say this year, that murder under New York law is not a violent crime because that's how they roll. So, good luck in the Supreme Court. But, you know, we've decided this issue. We've decided the issue that says... Including the precise, the same hypos. It's the same hypos that you've raised, that Barrett said, even though McCoy didn't consider... Yeah, okay. I'll move on. There were two wrongly admitted pieces of evidence that was very prejudicial to Mr. Thompson. One is the security camera evidence. There's a security camera found in Elias's car that has no connection whatsoever to the robbery, but it was portrayed as having a connection. It was the same brand camera as a camera that was mounted there years later, but we don't know what the camera looked like at the time of the robbery. We don't know what brand it was, and it was high on the wall, and there was no evidence that it was taken. Yeah, I'm a little puzzled by the argument. And I see the point in a way that this is a pretty weak beer for the relevance on the one hand, but that also makes it pretty weak for the prejudice aspect. There's a particular brand of device found in the car that is the same as a brand of device that may have been at the scene of the robbery. Okay, what does that prove on the one hand, and what's the big deal on the other hand? There's nothing illegal about having such a thing. It was all put to the jury in terms of what does that prove and what does it not prove. And the jury, hypothetically, we're supposed to assume that the jury decided all these issues in favor of the government. I think mostly it's very unlikely that this is the thing that made any difference to the case at all. I'm gonna push back just to this. I guess the question part is, why isn't that just ultimately for the jury to decide? Because there was very little physical evidence placing Mr. Thompson at the robbery. There was lots of- And there still was after this thing came in, very little evidence, physical evidence. Well, but also we have the bloody gloves. So that's my other- Oh, that's another thing, but that's got, okay, well, that's a different story. But this is, you know, they have an argument as to why this could link up. The judge says, well, you know, all right, let the jury decide. I think that's what judges do. And then the jury has to decide what they make of it. And there was argued to the jury what to make of it by both sides. And the jury did whatever it did. If the jury thought it was probative, maybe they're right. And if the jury thought it wasn't probative, then no harm. It's just- It's not a question for the jury to be able to answer. It's totally irrelevant. There's no probative value whatsoever. No, you see, I think, I disagree because it doesn't need to have very much probative value to be relevant. Does it have any tendency at all? Well, if you make certain inferences that you're suggesting are relatively implausible inferences, like that somebody during the middle of the robbery got a ladder and climbed up on it and ripped this thing off the wall. There was no evidence of that. Of course there's no evidence of that. So you're saying, therefore, the theory that this was stolen is pretty bogus. Okay, well, that's it. But there's a connection. There's a series of inferences. That could have happened. It probably didn't. It was argued to the jury that that's unlikely. And there's not, unlike a pair of bloody gloves, which is a whole other story, there's nothing that, oh, well, maybe this doesn't prove anything relevant, but, oh, boy, anybody who had a thing like this in his car must be guilty. The only way it could be guilty is if the jury drew a certain set of inferences about what happened. They would have been impermissible. I suppose, yeah, that your argument is that the inferences that the government's inviting the jury to make are so wildly speculative that inviting them to make those inferences on this record is prejudicial without any countervailing proof. That's exactly right. I think we get your argument on that. If you wanna go on to the gloves. So the gloves, the problem with the gloves was that they were suppressed. And they were suppressed for good reason. The prosecution never said anything about them until at the eve of trial, never allowed the defense to test them to see whether the bloody gloves were, in fact, bloody or whether that was something else. And if they were, in fact, bloody, was the blood related to the victim of the crime or what? And- Would there also have been a suppression motion? Wouldn't there have been a suppression motion? Because aren't the bloody gloves found during the problematic traffic stop and the problematic searches that resulted from that? Yes. So that would be another thing the defense could have- That's right. That's right. Because all of that had been decided, when the government asked the question, the question itself, did you have gloves on you, that was impermissible. And so that did not open the door properly. Of course, if they had been suppressed under the Fourth Amendment, then they could have been introduced to impeach the witness, couldn't they? Who said nothing about gloves or, and he did not deny- He didn't say anything about gloves, wouldn't it? If he's denying that he knows anything about this crime and he's just a guy who held a cap and he turns out to have bloody gloves in his pocket, albeit bloody gloves that perhaps were seized in violation of the Fourth Amendment, why couldn't that be introduced as impeachment evidence? Because it has to be impeaching something related to the issue, to the material itself, the gloves. Why? Well, I mean, if it's drugs that were illegally seized from somebody and he testifies that he didn't know anything about this conspiracy, well, I guess that's related, but it's just more evidence. It's evidence that he really did it. That's what makes that- But on that theory, when a defendant takes the stand, all suppressed evidence may be brought in for impeachment. That's- Well, if it's suppressed evidence that casts doubt on his story. Well, suppressed evidence would always cast doubt on the story, I would say. That's why it was suppressed because defense- Suppressed because it was illegally seized. Well, because the defense challenged it because it's probative. So, you know, that rule would, you know, that would prevent defendants from ever taking the stand because all suppressed evidence could then be admissible. It has to be related, you know, if he had said, I didn't have anything related to this, he wouldn't have had to say gloves, but he would have to say something about possessing something that would open the door. And this, he did not. Can I just ask briefly? It struck me that the government isn't really making this argument, but it struck me that the objection came late here. If you look at it, obviously there was the sidebar, which ended up being about the gun and not this, no objection there. But then in the question, it was, and one of those items is this pair of bloody gloves. Is that right? Answer, no, that's not right. Question, and that's where I think the objection should have been. Question, this pair of gloves that were taken from the right pocket of Thompson date of birth, July 19th. Then there's the objection. I'm not sure what to make of it, but it seems like there was a failure to object before the answer, which then kind of provides the predicate to bring it in. Do you have a view on that? Only that if it was a little late, that doesn't make it completely, you know, he could have asked it to be stricken. He didn't, you know, but that, you know, the lateness of the objection, and he continued with the objections, you know, along with the fact that this was suppressed and it was, you know, a pretty abrupt question. Didn't the government introduce that sidebar with the bloody gloves? Isn't that what they wanted the sidebar for? Yes. Yes, and there was no objection made then. Right. It just seemed like the lawyer had the, defense counsel had the gun in his head and it doesn't seem to be focused at all on the gloves. I think that's right, yeah. But it's not, at least it's not abrupt at the time the question was asked because the government flagged it was gonna ask the question. Yes, I'm out of time. I just wanna point out that the argument we're making about Detective George's testimony is not that it was only, not only that it was cumulative, but that it was putting summation into evidence. Thank you. Thank you. Attorney Rehnquist. May it please the court. My name is Dana Rehnquist. I'm an Assistant United States Attorney in the Eastern District of New York and I represented the government below. We're here today because appellants raised a number of claims stemming from the trial in which they were convicted of Hobbs Act robbery and possessing a firearm and furtherance of that robbery of a drug stash house. As explained in our brief, each of the claims raised by the appellants is without merit and the judgments against both defendants should be affirmed. I want to address some of the points that were raised first as it pertains to the introduction of the evidence of Matthew Elias's gang affiliation. Here, the evidence was not introduced when Matthew Elias denied having met Hyp Mya. We agree that Hyp Mya testified on direct examination. He had never met Matthew Elias, who he knew as Hedis, until the night of the robbery. The evidence was introduced when Matthew Elias said that he had never heard of Hyp Mya. And this is a point that I think your honors were focused on. The post from social media, which were post, one post had a date, which was February, 2019. The other post did not. Mr. Elias was not arrested until July of 2019. And if Mr. Hyp Mya is the five-star general, the leader of the Mackball Brims that Thompson's counsel is trying to portray him as during trial, then this evidence was introduced to show that it's not credible that Matthew Elias, who was a self-proclaimed member of this gang, albeit two years later, had never heard of the most prominent leader of this gang. Did the government introduce evidence? Was there evidence that Hyp Mya was the five-star general? Hyp Mya testified to his role in the gang during his direct examination. What did he say about it? He explained that he was one of the leaders of the gang. He operated this robbery crew, and that other members in the robbery crew were also members of the gang. But I don't think we used the term five-star general. He is a leader. That's the fairest inference from the evidence, as opposed to in arguments of counsel. That's correct, your honor. But I think what's particularly important here is this is all supposed to be viewed, even if you believe it wasn't a piece of discretion, under a harmlessness standard. Here, there was a specific limiting instruction that pertained to this evidence, that this evidence was only supposed to be used for the relationship purposes among the defendants. And there was no objection at the time to the limiting instruction, the scope of the limiting instruction. And juries are presumed to follow these instructions unless there's evidence to the contrary, which there is not here. Then moving on to the issue of- Is the limiting instruction doing anything more than you can use it for the purpose of assuming gang affiliation? The limiting instruction, which is at Governments Exhibits 230 to 31, says you may consider the evidence only for the purpose of proving relationships among people involved in this case. You may not infer that the defendants were guilty of participation in criminal conduct merely from the fact they had relationships with people who were associated with, or were associated with themselves, members of the McFarland Street gang. And then, Your Honor, turning to the issue of the gloves, the gloves were suppressed not because of any arguments that the gloves were unduly prejudicial. They were suppressed because of discovery violations. Right, they didn't get to make the arguments about Fourth Amendment violations or anything else because they didn't get it until after Rule 16 would have required it. And that was the basis for suppression. I mean, is the government's view that once something gets suppressed, if a defendant testifies, then they can always be asked about the evidence? Did it exist? Was it, you know, did you have it wherever it was searched? And that opens the door. Either they say yes, therefore negating the suppression, or they say no, and then it comes in as contradicting. Your Honor, I believe the Supreme Court case in US v. Havens, which we did not include in our briefing, but the site is 446 US 620, is instructive here, which says that suppressed evidence can be admitted on cross-examination because. Yes, go ahead. That's the principal case on Fourth Amendment suppressed evidence being admissible. And I think the question is, well, what are the limits of that? And I was suggesting to your friend on the other side that it is very broad, I guess, because if the suppressed evidence casts doubt on the story that the person tells, that's what impeachment evidence means, isn't it? Your Honor, we agree completely. And I believe that Havens actually addresses the Agnello case, which was relied on by my friend. And the Havens case is what's applicable here. Lateef Thompson testified incredibly that he was kidnapped, that he had no participation in this robbery, which is consistent with the overwhelming evidence that presented at trial against both defendants, not only testimony by Hibmaiah, but cell phone records, cell site records, LPR records, the jail calls in which they're discussing that. Well, what's relevant here is not how much other evidence there is. What's relevant is this evidence, and does it impeach? And so the idea, I think, would be if he testifies, I was just a guy hailing a cabin. Next thing I know, I'm being dragged along to all of these places that I didn't want to go and things I didn't want to see against my will. And here's a pair of bloody gloves that you had in your pocket after the robbery in which there was lots of bloodshed. That tends to cast doubt on the story. So I would have thought, the thing about Havens is that's a Fourth Amendment suppression. And the Fourth Amendment suppression suppresses evidence, notwithstanding that it is highly probative, because of police misconduct that needs to be deterred. Is there a comparable case about evidence that is excluded because of a discovery violation? Because here, I was the one who brought up the possibility of suppression. And Mr. Lasier was focused on the fact we don't even know this is blood because we never had the opportunity to test it because of the late disclosure. And that's a kind of prejudice that goes to the actual probative value of the evidence about anything. Your Honor, I'm not. Any comment about that, how that might be the distinction from Havens? Your Honor, I'm not aware of any case that addresses that specifically. I do believe that whether or not the spots on the glove were blood or not goes to weight, not admissibility. And here, this isn't a case where it was a sanitized robbery. There was evidence already in the record that blood was spilled during the course of this robbery. And of course, what the witness says is, no, that wasn't mine. And then eventually has to admit that, yeah, I did have that. And he doesn't say, but those were just things that I used when I was using red paint or anything like that. He sort of accepts the idea that blood was. He didn't admit that he had them. He said that the voucher read what the prosecutor asked if the voucher read. That's correct. I mean, it's odd to sort of think about saying, well, it's not that prejudicial because it wasn't even tested to figure out whether it was blood or whose it was. When that information could have been quite exonerating or quite incriminating, depending on what it was, and defendant never had an opportunity to do that. I mean, it is. Your Honor, factually, there would have been no blood to compare it to because the victim was unidentified. So there wouldn't have been an opportunity to actually confirm whether or not this was the victim's blood. So independent of identifying whether or not it was blood, even having gloves in your pocket when you're committing a robbery is indicia of guilt. You don't want to leave fingerprints. There were other arguments you could have made about the probative value. And as it pertains to the blood itself, again, they argued to the jury that there was no testing, that they did not know this was blood. And we have to analyze this under the harm. The jury saw the gloves. The jury did see the gloves. Lay people have experience of what bloodstains look like and have experience of what paint looks like, right? Yes, Your Honor. Can I shift, if my colleagues are OK with this, to the forfeiture conversation? This court has previously, in a non-presidential opinion, acknowledged that the reasoning of Honeycutt would apply to forfeiture under 981. I take it your position is contrary. Can you talk a little bit about why we should conclude that it's logical to fuse these proceeds as traceable to the crime when they never actually made it, even for a nanosecond, into the hands of the defendant? Your Honor, our position is that we obviously did not brief whether or not Honeycutt should apply to 981 because we believe that you don't need to address that issue. Because here, unlike in Honeycutt, there is no conspiracy and there's no joint and several liability. Why does that make a difference? I mean, it's not just about joint and several liability. What about any liability at all? I mean, the point of Honeycutt is that the guy was asked to forfeit something that was not his. The conspiracy, if anything, strengthens the case for why there should be forfeiture because it's a partnership. So if his partner had it, he had it. And here, you're saying there is no conspiracy charge. Although, I don't see really why that makes any difference either side because it was a conspiracy, whether it was charged as such or not. Clearly, this was joint activity that was undertaken. So why would it be a possible distinction that in one, oh, they were charged with joint activity, and in this one, they just engaged in joint activity? Why does that matter to the point of Honeycutt? Understood, Your Honor. And we agree that there has not been a case in the circuit where an individual who did not actually walk away with a proceeds. Well, here's the one. So let's figure out what we should do with it. Your Honor, I think there is a good faith basis to order someone to pay a forfeiture money judgment when the intent of the robbery was to share in the proceeds. And there was a period of time in which all of the defendants did have some control over the proceeds. This happened. So in this case, that when they got to the first house, Elias had some possession of the money, and therefore, it's OK to forfeit it because even if it ultimately left his possession, he had it at some point. At that period of time when they went to hit Maya's house and they opened the safe, they were in possession of the proceeds of the robbery. OK, so that's the, your argument is a factual argument. You started by saying there's a good faith basis for saying, and I think the question here is not whether anybody's acting in good faith, right? It's what the law permits. And so I want to understand whether your view is that the principles underlying Honeycutt don't apply at all under 981c1 or whatever we're under here, or whether you're saying even if they do apply, there's a factual reason why this doesn't fit into that box. Your Honor, I believe that the factual reason has sort of the most weight here. There were multiple times after the robbery which Elias was in possession and had control over the proceeds. And there were two times in which that happened. First, when they went back to the Galway residence and they opened the safe. And second, when they went back to Nikita or Woods' residence and they were distributing the marijuana among the robbery crew. The intervening fact that happened, which resulted in Elias not actually physically walking away with the marijuana they were intended to distribute, is that Elias was arrested. Right, before that second incident, am I misremembering? It was after the second incident. So there were the incident first, directly after the robbery when they opened the safe at Hitmaya's house. Then when Hitmaya realized that Woods and Henderson weren't. Elias wasn't with Hitmaya at his house, was he, when they opened the safe that first time? Am I misremembering who's where? Your Honor, the cell site data does put Thompson and Elias there at Hitmaya's residence. Hitmaya did not remember that and did not testify to that. But Elias's, the cell site data for Thompson and Elias drove Thompson, put him at the Galloway residence. Also, Thompson testified that he went back to Hitmaya's residence, or Thompson's post-arrest statement said that he went back to Hitmaya's residence. But why is that different from Honeycutt? I mean, both of the, they were brothers, I think, right, in Honeycutt? They were partners. And one of them was in jail, I think, which I guess is a slight factual distinction. But the idea of sort of constructive possession, they were partners. They both had some control over this. But in fact, it was the other brother who wound up with the lion's share of this money that was forfeited. And I don't see why that's any different than here. Elias never had $10,000 in his hand. He never had sole possession of that. What he had was constructive possession of all of the proceeds of the robbery that were in somebody else's hands at all time that we have no idea what his share was going to be at the beginning. And at the end, he winds up with Zippo because Hitmaya takes all the money except for what he gives to the tipster who told him about the stash house, who's not one of these guys at all on the robbery crew. So where, why would it be fair, why would it be the part of the goal of Congress in stripping people of the ill-gotten gains to take money that this guy never gained in any meaningful sense that I can see? Your Honor, there are two points I'd like to make. First is a factual issue. There's both the money that they were intending to distribute and there are the marijuana plates that they were intending to distribute. They opened the safe and they found the money while they were at Hitmaya's. And then every member of the robbery crew then reconvened at the Nikita's residence or Woods' residence and they were dividing up the marijuana. They decided that Hitmaya made the executive decision that they were going to divide up the marijuana at his residence instead. They all leave Woods' residence on their way back to Hitmaya's residence. And Hitmaya has all that stuff in his car. He does, and the reason Elias- And when it's all over and all those other guys get arrested, he takes it all. And he takes it all, as I read his testimony, not because, well, they were in jail, what the hell, I had it. He takes it because he thought that the robbery crew was trying to stiff him for the marijuana and the punishment was, I'll just take it all. So again, I just have trouble understanding why does this mean that Elias is on the hook for $10,000 of proceeds from this crime? Your Honor, we understand that this is a unique argument. We believe that Elias had the intent and there were periods of times after the robbery which he did have constructive possession over the proceeds. Intended loss, for example, is a feature of sentencing guidelines, right? And that makes sense. If I'm trying to steal a million dollars, at least if there's any reasonable possibility I can actually succeed in that, that's a million dollar attempted larceny. But when we're talking about restitution, we don't do that because the victim only can get back what the victim lost. And it seems to me the same principle applies to the forfeiture, that the forfeiture, just as the victim can only get back what the victim lost, the perpetrator can only cough up what the perpetrator gained and what they intended to gain. I mean, you wouldn't say he's guilty, well, maybe you would, but is it the government's position that if the whole robbery had failed and the police arrived on the scene and they arrested everybody, including the people in the stash house and seized all the drugs, that you would toad up the value of the drugs and then have the would-be robbers forfeit what they intended to take? Your Honor, that would not be the government's position. So then why does the intent make a difference? That's your argument, is that the intent is one of the things that makes a difference. Can we put that to one side now? Yes, Your Honor. Your Honor, just circling up on this issue, if the court disagrees with this analysis, we do believe that the proper remedy here would just be to vacate the forfeiture order, which is what the court did in McIntosh. Yeah, I mean, I don't think they're asking for anything else on that point. Right, I mean, they want a lot more relief, but the other relief is tied to that. You mean, there's not a resentencing or something like that? That's correct, Your Honor. It's just vacating the order. That's correct, Your Honor. If the court has no further questions, we'll rely on our brief for the rest of the argument. It's appreciated, thank you. Mr. Goodman, it looks like you reserve two minutes. Thank you. Well, as to the forfeiture, first of all, there was no finding, of course, by the district court that if the government's theory about supposed constructive possession during the events of the robbery were a valid theory. There's no finding on that, and I strongly disagree with the government's reading of the record. I don't think there's anything in the testimony that connects Mr. Elias to having any conversation about the distribution of the proceeds. At any point, at any relevant point. But that's certainly not a, there's no finding on that, and that wasn't the basis for the forfeiture here. If I could just go back to the government's point about the gang evidence. The reason it's prejudicial, the district court judge in his pretrial ruling cited cases and made his own finding that this kind of evidence lends itself to a high risk of prejudice. That's the reason gang evidence is, courts have to be cautious about admitting it, and the fact that there was a limiting instruction is sort of beside the point in that regard because the danger is that the evidence will be used for an improper purpose, which is to suggest propensity, and that's precisely what it would do here. Well, of course, what's interesting about that is that the archetypal propensity evidence is prior convictions, right? And that's something that is always, almost always, kept out of the government's case in chief. But if a defendant takes the stand and testifies, then he can get impeached with that kind of evidence. And it seems to me that this is somewhat similar. It's a probative prejudicial issue. Ex ante, there's no particular reason to think that his membership in the gang is gonna have any probative value, and it is pretty prejudicial, and so the judge keeps it out. But then once he testifies, and his testimony is, I'm just an innocent cabbie, and I didn't have anything to do with this, and here he is in a meeting with a prominent member of a gang, and it turns out that, like the other people in the crew, he may also be a member of that gang. That takes on, doesn't it take on a different degree of probativeness? Maybe it's propensity-ish, but it changes the calculus from what it was before the trial, doesn't it? Well, the problem is, it didn't prove that, because it's after the fact, and the government's argument that what it was really about was to show that he knew Hitmia's reputation. It's a pretty strained inference, is what you're saying. It is, and there was a limiting instruction that limited it to, it was to establish a relationship. The government didn't object to that instruction. So, I don't see that as a basis for upholding the decision. Thank you. Thank you all very much. Appreciate your arguments. We will take this under advisement.